**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**ELOISE KROON**,

          Plaintiff,

        v.

**NATIONAL RAILROAD PASSENGER
CORP. d/b/a AMTRAK**,

          Defendant.

</td><td>

Case No. 23-cv-2948 (CRC)

</td></tr>
</table>

**MEMORANDUM OPINION AND ORDER**

Veteran Amtrak employee Eloise Kroon claims the company intentionally lowballed her on an internal job offer because the hiring manager did not want a Black person on his team. Just a few weeks before Ms. Kroon received the offer, another Amtrak employee reported overhearing a member of that team telling the hiring manager, "I don't want to work with those n*****s"—to which the manager replied, "Don't worry, I've got a plan for Eloise so she stays where she is."

Eloise did stay where she was; she declined the job because of the salary. She then sued Amtrak, alleging employment discrimination based on race in violation of 42 U.S.C. § 1981. Amtrak now moves for summary judgment, arguing that it offered her that salary for a legitimate reason—it was near the maximum it could provide for the position. But the record leaves that up for debate. Based on the evidence before the Court, a reasonable fact finder could reject Amtrak's proffered justification for Kroon's salary offer and instead find that Amtrak lowballed Kroon because of her race. Accordingly, the Court will deny Amtrak's motion.

I.    **Background**

A.  Factual Background

Eloise Kroon is a Black woman who has worked for Amtrak in various positions since 2011.  ECF 20-2 (Amtrak Statement of Undisputed Material Facts (Amtrak SUMF)) ¶¶ 1–2; 21-1 (Kroon Statement of Genuine Issues of Material Facts (Kroon SMF)) ¶¶ 1–2.  In 2022, she was employed as a procurement technician, earning approximately $70,000 annually.  Amtrak SUMF ¶¶ 3–4; Kroon SMF ¶¶ 2–3.

In May 2022, Amtrak listed a job opening for a new position, Vehicle Vendor Services Associate.  Amtrak SUMF ¶ 5; Kroon SMF ¶¶ 4–5.  The posting did not provide a specific salary but identified the pay band as "C1N."  ECF 20-9 (Vehicle Vendor Services Associate job posting), at 2 (page numbers designated by CM/ECF).  Kroon applied and requested a salary of $75,000.  See ECF 21-2 (Kroon Decl.), ¶¶ 5, 8; 20-11 (Kroon's Candidate Screening Form), at 2 (page numbers designated by CM/ECF).

Amtrak's internal "recruiter" for this position was Donielle Jackson.  Amtrak SUMF ¶ 5; Kroon SMF ¶ 4.  As a recruiter, Ms. Jackson screens candidates for open positions by comparing their resumes to the job's qualifications.  Amtrak SUMF ¶ 7; Kroon SMF ¶ 7.  If a candidate's experience and skills line up with the requirements, Jackson recommends that candidate for an interview.  Amtrak SUMF ¶ 8; Kroon SMF ¶ 7.  In this case, Jackson determined that Kroon was qualified for the Vehicle Vendor Services Associate position and passed along her application for an interview.  Amtrak SUMF ¶ 24; Kroon SMF ¶ 13.  Jackson generally does not participate in candidate interviews, which are conducted instead by a panel of three Amtrak employees, including the position's hiring manager.  See Amtrak SUMF ¶¶ 9, 26; Kroon SMF ¶ 14.

The hiring manager for the Vehicle Vendor Services Associate position was Thomas Teti. Amtrak SUMF ¶ 27; Kroon SMF ¶ 15. Kroon interviewed with him and two others in late May 2022. Amtrak SUMF ¶ 26; Kroon SMF ¶ 14; ECF 20-11 at 2. Less than two weeks later, another Amtrak employee says she overheard Teti talking to a new hire on his management team. ECF 21-3 (Alixandria Turner Decl.) ¶¶ 3–4. The new hire reportedly told Teti: "I don't want to work with those n*****s." Id. ¶ 5. "Don't worry," Teti is said to have replied. Id. "I've got a plan for Eloise so she stays where she is. Don't worry about who you'll be working with." Id.

Meanwhile, Kroon's application proceeded. Consistent with her practice, Jackson facilitated a "consensus meeting," where the interviewers discussed Kroon's candidacy. Amtrak SUMF ¶¶ 10–11; Kroon SMF ¶ 8. Jackson testified at her deposition that Kroon's consensus meeting was unremarkable, and that she and the interviewers, including Teti, decided to offer Kroon the job. ECF 20-4 (Jackson Dep.), at 30:15–32:7.

Once a candidate is chosen, Jackson recommends a salary to the hiring manager, who must approve the salary before the candidate is given an offer. Amtrak SUMF ¶¶ 13, 18, 22; Kroon SMF ¶ 9, 12. Jackson bases her salary recommendation on a salary band provided by Amtrak's Compensation department and the compensation of other employees with the same job title and tenure. Amtrak SUMF ¶¶ 14, 20; Kroon SMF ¶¶ 10–11. The salary band from Compensation establishes a minimum, mid-point, and maximum salary for the relevant role. Jackson Dep. at 35:11–17. The Compensation department must approve any salary outside that range. See id. at 51:13–14.

Kroon has filed a declaration stating that, after her interview, Teti rang her cell phone to ask whether she would accept the position for $65,000 or "what [she] would take." Kroon Decl.

3

¶ 16. Kroon recounts telling Teti that she would not accept $65,000 because that was lower than her current $70,000 salary. Id. She further describes how, after this call, Teti would approach her at the office to ask her "what [she] was going to do about the job" and whether they were "scaring [her] away yet." Id. ¶ 17.

On June 21, 2022, Jackson met with Teti to discuss salary offers for the candidates. See ECF 21-4 at 36 (page numbers designated by CM/ECF). A Microsoft Teams invitation for this meeting lists what appear to be proposed salaries of "$67K" for Eloise and "$64K" for an external candidate who was white. Id.; see also Kroon SMF ¶ 37.

At the end of June, Jackson called Kroon to offer her the job—but at $64,000. Kroon Decl. ¶ 18. Kroon was disappointed. Id. She claims that, when she asked Jackson why the salary was so low, Jackson responded that she had wanted to offer her more, but Teti would not let her. Id. Jackson disputes Kroon's account, testifying at her deposition that she proposed the $64,000 salary, and that Teti played no role in arriving at that number. Jackson Dep. at 36:8–37:6.

Kroon declined the job offer because of the salary, and Amtrak hired two external, white candidates, at the same $64,000 salary it offered Kroon. Amtrak SUMF ¶¶ 36–37; Kroon ¶ 19.

B. Procedural Background

Kroon sued Amtrak, alleging employment discrimination based on race in violation of 42 U.S.C. § 1981 and seeking compensation for emotional distress and lost income, as well as punitive damages. ECF 1 (Compl.) ¶¶ 13–15. The parties engaged in discovery. Amtrak now moves for summary judgment.

4

## II.    Legal Standards

To prevail on a motion for summary judgment, the moving party bears the burden of demonstrating "that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895–96 (D.C. Cir. 2006). A fact is "material" if it can affect the outcome of the litigation. Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.

In considering a motion for summary judgment, the Court must resolve all factual disputes and draw "all justifiable inferences" in favor of the non-moving party. Liberty Lobby, 477 U.S. at 255; see also Mastro v. Pepco, 447 F.3d 843, 850 (D.C. Cir. 2006). "At summary judgment, material will be disregarded only if it 'cannot be presented in a form that would be admissible in evidence' at trial." Ali v. District of Columbia, 810 F. Supp. 2d 78, 83 (D.D.C. 2011) (quoting Fed. R. Civ. P. 56(c)(2)). But "[w]hile a nonmovant is not required to produce evidence in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence." Gleklen v. Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1369 (D.C. Cir. 2000).

Finally, "a party may oppose summary judgment with sworn testimony, and . . . that party's own sworn testimony can alone defeat summary judgment." United States v. Seventeen Thousand Nine Hundred Dollars ($17,900.00) in U.S. Currency, 859 F.3d 1085, 1092 (D.C. Cir. 2017); see also United States v. Johnson, 823 F.3d 701, 710 (D.C. Cir. 2016) ("[E]vidence a party proffers in support of its cause will usually, in some sense, be 'self-serving[,]'" but "[i]t is

nonetheless beyond question . . . that parties . . . are legally competent to give material

testimony" and may be "the key, or even sole witnesses.").

### III.  Analysis

Section 1981 protects the right of "[a]ll persons within the jurisdiction of the United

States . . . to make and enforce contracts," including "the enjoyment of all benefits, privileges,

terms, and conditions of the contractual relationship."  42 U.S.C. § 1981.  This protection applies

to employment relationships, so § 1981 prohibits discrimination in the workplace.  See Yazzie v.

Nat'l Org. for Women, 712 F. Supp. 3d 56, 75 (D.D.C. 2024).  To prevail on a § 1981

employment-discrimination claim, "a plaintiff must initially plead and ultimately prove that, but

for race, [she] would not have suffered the loss of a legally protected right."  Comcast Corp. v.

Nat'l Ass'n of Afr. Am.-Owned Media, 589 U.S. 327, 341 (2020).  A plaintiff can make out an

employment-discrimination claim under § 1981 with direct or circumstantial evidence of

discrimination.  See Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO, 548 F.3d 137, 144 (D.C.

Cir. 2008).

### A.  Direct Evidence

"Direct evidence of discrimination is evidence that, if believed by the fact finder, proves

the particular fact in question without any need for inference."  Lemmons v. Georgetown Univ.

Hosp., 431 F. Supp. 2d 76, 86 (D.D.C. 2006) (emphasis omitted) (citation omitted).  For

example, in Ayissi-Etoh v. Fannie Mae, 712 F.3d 572 (D.C. Cir. 2013), the plaintiff was

promoted but denied a salary increase, and his manager told him:  "For a young black man smart

like you, we are happy to have your expertise; I think I'm already paying you a lot of money."

Id. at 576.  With that statement, the manager explicitly connected the alleged discriminatory

action (denial of a salary increase) with the plaintiff's race, so the Circuit concluded the plaintiff had direct evidence of discrimination.  Id. at 576–77.

Kroon contends her case is similar.  She asserts that "Teti stated explicitly how he would prevent Kroon from taking the promotion"—by "offering Kroon significantly less money *because* she is Black."  ECF 21 (Opp.) at 6.  But that is not accurate.  When a new hire on his team reportedly told Teti that she did not want to "work with those n*****s," Teti replied that she need "not worry about who . . . [she would] be working with" because he had "a plan for Eloise so she stays where she is."  Turner Decl. ¶ 5.  But Teti did not say what his plan was.  Kroon theorizes his plan was to lowball her so she would not take the job.  But an inferential step is required to connect Teti's alleged discriminatory motive to his alleged conduct.  Accordingly, Kroon has not offered direct evidence of discrimination.  The Court will therefore proceed to consider whether she has provided enough circumstantial evidence of discrimination to survive summary judgment.

B.  McDonnell-Douglas

Where no direct evidence exists, the McDonnell-Douglas burden-shifting framework applies and "set[s] forth the basic allocation of burdens and order of presentation of proof." George v. Leavitt, 407 F.3d 405, 411 (D.C. Cir. 2005) (quoting Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 252–53 (1981)); see also Brown v. Sessoms, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (applying McDonnell-Douglas to § 1981 claims).  Under this framework, the plaintiff must establish a prima facie case of employment discrimination by showing "that (1) [s]he is a member of a protected class; (2) [s]he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination[.]"  Brown, 774 F.3d at 1022 (quoting Forkkio v. Powell, 306 F.3d 1127, 1130 (D.C. Cir. 2002)).

7

"An adverse action is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'"  Sharpe v. Bair, 580 F. Supp. 2d 123, 131 (D.D.C. 2008) (quoting Broderick v. Donaldson, 437 F.3d 1226, 1233 (D.C. Cir. 2006)).  As a legal matter, lowballing an employee to dissuade her from taking a position may constitute an adverse employment action.  An employer effectively denies an employee a promotion when the employer offers her a salary knowing she will not accept it.  See Violetto v. Village of Tinley Park, 130 F. Supp. 3d 1179, 1185 (N.D. Ill. 2015) ("[A] failure to promote (and, correspondingly, a failure to provide study materials necessary to secure that promotion) may constitute an adverse employment action.").

If the plaintiff establishes a prima facie case, the burden of production then shifts to the employer to offer a "legitimate, nondiscriminatory reason" for the adverse employment action.  Brown, 774 F.3d at 1023 (citation omitted).  Once the employer meets this burden, the McDonnell-Douglas framework falls away, and "the focus of proceedings at trial (and at summary judgment)" becomes "whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff."  Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)).  The burden of persuasion always rests with the plaintiff.  Id. at 1289.

Here, Kroon is a member of a protected class based on her race.  The alleged adverse employment action is the $64,000 salary offer.  And Teti reportedly telling a new hire on his team not to worry about whether she would be working with "those n*****s" because he had a

"plan for Eloise so she stays where she is" creates an inference of discrimination.  Turner Decl. ¶

5.  As do the conversations Kroon recounts with Teti about what salary she would accept.  A

reasonable juror could conclude that Teti's "plan" to keep a Black person from joining his team

was to offer her a salary he knew she would not take.

Amtrak advances a legitimate, nondiscriminatory reason for Kroon's salary offer—that

$64,000 was "at the top of the pay band set by Amtrak's Compensation department."  ECF 20-1

(Mot.) at 6.  As evidence, it highlights Jackson's deposition testimony that the amount offered to

Kroon was "at the top of the range," and that it was she, not Teti, who determined Kroon's

salary.  Jackson Dep. at 36:9–37:6.  Amtrak also points to an offer approval form for the white

male candidate who was ultimately hired for the Vehicle Vendor Services Associate position.

See ECF 20-12.  That form contains "[m]arket [p]ricing" data showing a salary range of

$51,602–$56,761 for a "[d]eveloping" hire and $56,762–$64,368 for a "[p]roficient" hire.  Id. at

6 (page numbers designated by CM/ECF).

But Kroon has offered enough contrary evidence for a reasonable juror to reject Amtrak's

justification and instead conclude that Amtrak offered her $64,000 for discriminatory reasons.

First, the Microsoft Teams meeting invitation from Jackson to Teti references what appears to be

a proposed salary of $67,000 for Kroon.  See ECF 21-4 at 36.  Neither side offers evidence as to

why the $67,000 salary figure was included in the invitation or whether it was discussed at the

subsequent meeting.  Absent additional detail, the salary reference supports a reasonable

inference that Jackson initially recommended a $67,000 salary and thus did not believe she was

limited to offering Kroon $64,368, as she later claimed in her deposition.  Second, Kroon states

in her declaration that Jackson told her she had wanted to offer her more money, but Teti would

not let her.  Kroon Decl. ¶ 18. Amtrak dismisses Kroon's statement as "unadorned," ECF 23

(Reply) at 8, but, as previously noted, a "party's own sworn testimony can alone defeat summary judgment." Seventeen Thousand Nine Hundred Dollars, 859 F.3d at 1092.  Balancing this evidence, a jury could conclude Kroon was offered only $64,000 because Teti intervened.  And, if it were to credit the proffered account of Teti's overheard conversation with a new member of his team, and Kroon's account of her interactions with Teti about what salary she would accept and whether he was scaring her away from the job, a jury could find he did so because of Kroon's race.  Accordingly, a dispute of fact remains over whether Amtrak offered Kroon $64,000 because that was the top of the range or because of her race.[1]

Neither Jackson's testimony nor the offer approval form eliminates that dispute.  Kroon and Jackson offer competing versions of events, which present a credibility issue for the jury. See United States v. Belt, 514 F.2d 837, 840 n.4 (D.C. Cir. 1975).  And the market pricing data included on an offer approval form for another external candidate with fewer years' experience than Kroon does not definitively prove that $64,368 was the maximum Amtrak could have offered her.  Crucially, Amtrak does not present evidence of any market pricing analysis conducted by the Compensation Department for Kroon.  Nor does it offer any evidence that Amtrak's salary band for "C1N" positions is capped at approximately $64,000.

In sum, Kroon has offered enough evidence to rebut Amtrak's legitimate, nondiscriminatory reason for the $64,000 offer and to convince a reasonable juror that Amtrak made her a lowball offer because Teti did not want a Black person on his team.

---

[1] As further evidence that Amtrak was not limited to offering her $64,368, Kroon has produced a document she claims is an internal Amtrak business record showing the company's salary bands, which lists the maximum salary for "C1N" positions as $80,800. ECF 21-4 at 20. But, because Kroon has made no effort to authenticate this document, the Court cannot consider it. See Fed. R. Evid. 901 ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."); Gleklen, 199 F.3d at 1369.

**IV.    Conclusion**

For the foregoing reasons, it is hereby

**ORDERED** that [ECF 20] Defendant's Motion for Summary Judgment is DENIED.  It is

further

**ORDERED** that the parties shall submit a joint status report by March 7, 2025, either

requesting a referral to mediation or proposing at least three mutually available trial dates.

**SO ORDERED**.

 

 

 

 

                                                    _____

CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>February 28, 2025</u>